**In the Matter of Harry Toussaint ALEXANDER, A Member of the Bar of the District of Columbia Court of Appeals.**

No. M–120–82.

District of Columbia Court of Appeals.

Argued Nov. 18, 1982.

Decided Sept. 7, 1983.

Wallace E. Shipp, Jr., Asst. Bar Counsel, Washington, D.C., with whom Fred Grabowsky, Bar Counsel, Washington, D.C., was on brief, for Bd. on Professional Responsibility.

James W. Cobb, Washington, D.C., for respondent.

Before KERN and FERREN, Associate Judges, and KELLY, Associate Judge, Retired.[1]

KELLY, Associate Judge, Retired:

In this disciplinary proceeding, the Board on Professional Responsibility (Board) concluded, consistent with the report of a Hearing Committee, that respondent, a member of the District of Columbia Bar, twice neglected a legal matter entrusted to him in violation of DR 6–101(A)(3), and once engaged in conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5). It recommended that respondent be suspended from the practice of law for three months. Respondent argues, in excepting to the Board's report, that (1) the

---

**1.** Judge Kelly was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on March 31, 1983.

Board erred in rejecting his claim that he was denied a fair and impartial hearing before the Committee; and (2) the findings of the Board, and the sanctions recommended by it, are inconsistent with the weight of the evidence.

Considering the Board's report in light of respondent's exceptions, we are required to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, . . ." and must "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." D.C.App.R. XI, Sec. 7(3); *In re Smith,* 403 A.2d 296, 302–03 (D.C. 1979). After careful scrutiny of the Committee hearing transcript, as well as the remainder of the record before us, we conclude that the Board's findings are supported by substantial evidence and that the recommended sanction of three months suspension is comparable to the disposition of cases involving similar misconduct. Accordingly, we affirm.

## I

The asserted instances of respondent's misconduct arise from his representation of two different clients. We separately set forth with regard to each the pertinent, uncontested facts found by the Board.

### Willie Alexander

Respondent was retained counsel for Willie Alexander who faced charges of driving under the influence and reckless driving. At respondent's request, a trial date of November 6, 1980, was set. On that date, before Judge Tim Murphy, the case was called. Present were the prosecutor, the government witnesses and the defendant; respondent never appeared. After approxi-

mately an hour delay, the case was continued to the following day.

During the afternoon of November 6, respondent was passed in the courthouse by Judge Murphy's clerk who advised him that a case in which he was involved had been continued to the following day due to his failure to appear. The clerk was unable to remember the name of the case. Respondent did not check in with the court.

The next day, November 7, the case again was called; all parties previously present again were present; respondent never appeared. The court continued the case. Later that afternoon, respondent finally appeared before the court. His explanations for his absence were refused, a complaint regarding his conduct having already been directed by the court to the Office of Bar Counsel.[2]

### Larry Fisher

In June 1980, respondent was retained by Larry Fisher to represent him at a probation revocation hearing. Respondent requested, and received, a one thousand dollar ($1,000) retainer. Thereafter, Fisher was indicted on an uttering charge. He again sought the representation of respondent who requested an additional one thousand dollar ($1,000) retainer. As arraignment on the uttering charge was to occur before the probation revocation hearing, Fisher agreed to "transfer" the retainer from the probation revocation case to the uttering case, until further payments could be made. Ultimately, Fisher paid at least five hundred dollars of the second retainer.

At the probation revocation hearing on August 25, 1980, respondent did not appear, sending in his place an associate with his firm, Patrick Patrissi. Patrissi, a member of the District of Columbia Bar, never before had handled a probation revocation; never before had spoken to respondent

2. Respondent appears to argue that the trial court acted improperly in directing a complaint of his misconduct to Bar Counsel rather than holding him in contempt. We disagree. Super. Ct.Crim.R. 42 authorizes summary punishment for criminal contempt in permissive terms: "A criminal contempt *may* be punished summarily . . . ." (Emphasis supplied.) In dealing with respondent's conceded contumacy, the court was not limited to summarily holding him in contempt. *See also* D.C.App.R. XI, Sec. 7(1).

about the case; and, in fact, by memo from respondent's secretary, was requested to substitute for respondent only that morning. Due to his admitted ignorance of Super.Ct.Crim.R. 32, which grants a defendant the right to postpone a revocation proceeding pending resolution of new criminal charges if those charges are used in pressing the probation violation, Patrissi raised no objection when, based upon Fisher's re-arrest, the court revoked probation and sent Fisher to jail.

While in jail, Fisher and his family attempted to contact respondent to request help. Respondent never returned the telephone messages left at his office. On one occasion, respondent's secretary informed Fisher when he called that, unless he fulfilled the retainer agreement, respondent would withdraw as his counsel. Some time later, respondent did withdraw from representing Fisher in the uttering case. Only after Fisher received new appointed counsel on this latter case was the erroneous revocation of his probation recognized and remedied by his release—more than six months later.

## II

Respondent challenges the Board's rejection of his claim that he was denied a fair and impartial hearing before the Committee. After submission of the Hearing Committee's final report, respondent objected in his brief to the Board that a member of the Committee, Willie Leftwich, harbored a personal prejudice against him. According to respondent, this bias arose from the fact that he had replaced Leftwich as litigation counsel on a case from which the latter had been discharged. To support his claim, respondent proffered affidavits of the clients involved attesting to the discharge of Leftwich and pointed to a pattern of allegedly inordinate questioning during the Commit-

tee hearing by member Leftwich and chairman Webb. The Board, in its report, found respondent's allegations to be unwarranted. We agree.

▊ To demonstrate a legally sufficient claim of personal prejudice, respondent was required to show facts: (1) which are material and are stated with particularity; (2) which, if true, would convince a reasonable person that bias exists; and (3) which show that the bias is personal, as opposed to judicial, in nature. *In re Evans,* 411 A.2d 984, 994 (D.C.1980).[3] Nevertheless, other than the bald assertion that he replaced Leftwich after discharge of the latter by the clients, respondent demonstrates no material facts from which an inference of prejudice may be drawn. Indeed, even the fundamental fact that Leftwich was cognizant that respondent was his replacement is assumed; and respondent presents no convincing explanation for why this fact would be true. Further, accepting respondent's assumption that Leftwich knew who succeeded him as counsel, such knowledge, without more, does not establish the existence of a personal bias against respondent.

▊ At the start of the Committee hearing, moreover, respondent was asked whether he had any challenges to the members of the Committee; his reply was, "None at all, Sir." In pressing his assertion of personal prejudice, respondent attempts to avoid the clarity of his response, claiming that at the time of the hearing he was unaware of Leftwich's purported conflict of interest. Nevertheless, similar to his inability to explain how, if at all, Leftwich knew that, after his discharge, respondent had replaced him as counsel, respondent fails to explain convincingly why, as successor counsel, he would not know that Leftwich was his predecessor.[4]

---

3. Since, in his role as a Hearing Committee member, Leftwich acted in an adjudicative or quasi-judicial capacity, the standard of disqualification for judicial officers applies. *See Vann v. District of Columbia Board of Funeral Di-* *rectors and Embalmers,* 441 A.2d 246 (D.C. 1982).

4. Respondent's assertion of the allegedly inordinate questioning of the Committee members as evidence of the bias against him is equally

Given the unsubstantiality of respondent's proof of prejudice, the Board was correct in finding his claim to be unwarranted.

### III

Respondent's second, and principal contention, is that the Board's findings, and the sanction it recommended, are unsupported by the weight of the evidence.

With regard to his representation of Willie Alexander, the Board concluded that respondent's failure to appear for trial on November 6–7 constituted a neglect of a legal duty entrusted to him, in violation of DR 6–101(A)(3), and conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5). Although the Board expressed its inclination "to be charitable of Respondent's assertion that he simply forgot that the trial of the case was scheduled for November 6," it found that this asserted lapse of memory was aggravated by several additional factors.

Foremost among these aggravating factors was respondent's apparently "cavalier" disregard of advice from Judge Murphy's clerk that one of his cases had been contin-

ued due to his absence. Respondent admitted receiving this information. Nevertheless, he did not check in with the court until the following day.[5] As a result, court proceedings twice were delayed and his client's trial twice was continued. This caused a loss of valuable time to the court, its personnel, and to every other participant in the trial—including respondent's client and the government's witnesses.

While respondent asserted that he spent November 6 in the courthouse, occupied with matters before other judges, he did not avail himself of the "locator" procedure established by the Chief Judge.[6] This procedure was established to facilitate compromise between the often conflicting schedules of court and counsel. By not taking advantage of this procedure on the morning of November 6, respondent created, and then succumbed, to the exact scenario which the procedure was designed to prevent. For these reasons, the Board concluded that respondent's conduct on November 6 and 7 evidenced "not only gross neglect but also an unenviable lack of appreciation of, and respect for, the judicial process and the Court itself."[7]

unfounded. Board Rule 8(c)(1) expressly permits the questioning of a witness by Committee members "for the purpose of clarifying matters brought up at the hearing." The record of the hearing does not evidence an abuse of this permission by the Committee members. In addition, the participation of only two members of the Committee in the filing of the report does not invalidate the Committee report. Two members constitute a quorum and the concurrence of both members made the report the action of a majority thereof. *See* D.C.App.R. XI, Sec. 5(1).

5. Respondent's assertion that this notice was inadequate because the clerk did not state the name of the case is groundless. The gist of the message was that some case involving respondent had been continued for trial due to his failure to appear. At the very least, this information should have prompted respondent to verify its substance. Ignoring it as respondent did, however, merely exacerbated the delay of an already crowded traffic court calendar.

6. The "locator" procedure permits attorneys to telephone the Chief Judge's Chambers before 8:45 a.m. and give the clerk a list of the attor-

ney's other court appearances scheduled for that day. This list then is distributed to all trial judges in order to facilitate locating an attorney when needed.

7. In addition, respondent admitted that his court calendar reflected no entry for the November 6 trial date before Judge Murphy. Although the Board noted that, "It is essential to the orderly administration of justice in the Superior Court that attorneys give scrupulous attention to cases calendared for trial," it did not address the question whether respondent's failure to update his court calendar violates Super. Ct.Civ.R. 104(c)(1). That rule states: "Attorneys are expected to carry with them at all times they are in court a calendar of their future court appearances," *id.; see* Super.Ct. Crim.R. 57(a), and expressly places the "professional responsibility" to avoid the setting of conflicting court engagements upon counsel, not the court. *Id.* To carry a court calendar, yet fail to note in it future court appearances when they arise, violates the spirit, if not the letter, of this rule.

As to respondent's representation of Larry Fisher at the August 25, 1980 probation revocation hearing, the Board concluded that he further violated DR 6–101(A)(3). Assuming, without deciding, the permissibility of respondent sending his associate, Patrick Patrissi, to represent Fisher at the hearing, without Fisher's express prior consent,[8] the Board still found that respondent grossly neglected his client's interests.

This conclusion was based upon the Board's finding that, before the hearing, respondent did nothing to prepare Patrissi for substitution. He discussed with Patrissi neither this case specifically nor probation revocation hearings in general. Patrissi's inexperience in such matters apparently little concerned him. In addition, by notifying Patrissi of his need to substitute on the morning of the hearing, respondent permitted him little, if any, time to prepare on his own.

Rejecting respondent's several "dissembling excuses," the Board found that his neglect in not appearing at the hearing was compounded by his further neglect of Fisher's interest after the erroneous revocation of probation. By office memorandum that

same day, Patrissi reported to respondent that Fisher's probation had been revoked. Nonetheless, respondent took no action to rectify this error during the entire six-month period of Fisher's detention. Respondent did not even bother to return the numerous phone messages left at his office by Fisher and his family.[9] From this history of "callous disregard" for, and wilful neglect of, Fisher's interests, and of a failure even to concern himself with his client's resulting incarceration, the Board concluded that respondent flagrantly violated DR 6–101(A)(3) by neglecting a matter entrusted to him.

Given the record before us, we cannot say that these findings are unsupported by substantial evidence. See D.C.App.R. XI, Sec. 7(3); In re Smith, supra, 403 A.2d at 302–03.

■ In determining what sanction to impose, the Board noted that respondent did not possess an unblemished disciplinary record. Three times during the previous two and one half years Bar Counsel informally had admonished him for neglecting a client's affairs.[10] The facts in the two cases

---

**8.** At the Committee hearing, Fisher stated that he specifically had retained respondent to represent him. He reasoned, "I was trying to stay out of jail. The man was an ex-judge. I felt like him being an ex-judge, he had a pretty good chance of keeping me out of jail." In light of this statement, the Board noted authority from other jurisdictions for the proposition "that a retained attorney is not authorized to hire another attorney or to delegate his authority to another without the consent of his client". *People v. Betillo,* 53 Misc.2d 540, 546, 279 N.Y. S.2d 444, 453 (1967) (citing cases); *see also Koehler v. Wales,* 16 Wash.App. 304, 307, 556 P.2d 233, 236 (1976). Nevertheless, since the Board did not rely upon this proposition in concluding that respondent neglected his client's interests, we need not address its application to the instant case.

Respondent asserts that, at the hearing, Fisher did not object to substitute counsel. Under the circumstances, we do not view this silence as constituting an express consent to the substitution. Nevertheless, whether Fisher consented to the substitution, in light of the Board's analysis, becomes irrelevant.

**9.** With regard to respondent's assertions as to the incredibility of his client, we note that the

evaluation of the credibility of a witness is for the fact-finding tribunal. The Hearing Committee heard this witness' testimony and submitted a report containing its findings of fact which were adopted by the Board. We are bound by these findings unless they are not supported by substantial evidence of record. *See* D.C.App.R. XI, Sec. 7(3).

**10.** In Docket No. 327–79, respondent was admonished for neglecting to file a timely motion to stay his client's eviction pending appeal from an eviction order of the lower court in violation of DR 6–101(A)(3). In Docket No. 423–79, respondent was admonished for neglecting to notify his client of the denial of a motion to vacate sentence and for his failure to timely note an appeal of the denial in violation of DR 6–101(A)(1) and (3). And again, in Docket No. 378–79, he was admonished for neglect in connection with the representation of the widow and two children of a man allegedly beaten to death by two deputy marshals. Bar Counsel found that respondent's delay for more than two years barred his client's claim against certain defendants and violated DR 6–101(A)(2) and (3).

before it, the Board found, further evidenced a "pattern of repeated neglect, a disregard for the orderly administration of justice, and at times a callous disregard for the interests of his clients." Under the circumstances, including respondent's complete candor and cooperation with the investigation of Bar Counsel, the Board recommended a three-month suspension from the practice of law.

Our review of the Board's recommended sanction is limited. Deciding each case on its own particular facts, *see In re Russell,* 424 A.2d 1087, 1088 (D.C.1980) (per curiam), we must "respect the Board's sense of equity, .... [and] enforce a general sense of equality in the sanctions handed out." *In re Haupt,* 422 A.2d 768, 771 (D.C.1980) (per curiam) (quoting *In re Smith, supra,* 403 A.2d at 303). Based upon the findings of the Board, which we affirm above, we cannot say that a three-month suspension is inconsistent with dispositions for comparable conduct or is otherwise unwarranted.[11] D.C.App.R. XI, Sec. 7(3); *In re Smith, supra,* 403 A.2d at 303. Accordingly, it is

ORDERED that respondent be suspended from the practice of law for a period of three months, effective thirty days from the date of this decision.

*So ordered.*

---

11. See *In re Knox,* 441 A.2d 265 (D.C.1982), where, in view of the respondent's prior informal discipline for neglect, we concluded that a three-month suspension was the proper sanction for the current neglect of a personal injury and worker's compensation claim. "[W]hen we have imposed [longer] suspension for attorneys found to have neglected a client's legal matters, the conduct complained of has been particularly aggravated or has been compounded by other violations." *Id.* at 268. *See, e.g., In re Haupt, supra* (respondent suspended for three years for neglect of a legal matter, deceit, misrepresentations to client, and intentional failure to seek client's objection); *In re Smith, supra* (respondent suspended for eighteen months for neglecting two civil matters and for misrepresentation to client concerning a case);

*In re Fogel,* 422 A.2d 966 (D.C.1980) (per curiam) (respondent suspended for a year and a day for neglecting a client's appeal and making misrepresentations to both the client and the court concerning the same); *In re Russell, supra* (respondent suspended for six months for serious neglect of client's cause, coupled with failure to cooperate with Bar Counsel). Here, as respondent asserts, his conduct encompassed neither criminal activity nor dishonesty nor misrepresentation. And, while he is charged with three violations of the disciplinary rules (two instances of neglect and one instance of conduct prejudicial to the administration of justice), he has cooperated completely and candidly with the Bar Counsel's investigation.